Filed 6/13/23 P. v. Ram CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOHNSON RAM,<br><br>Defendant and Appellant. | F084145<br><br>(Kern Super. Ct. No. BF181925A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. Gregory A. Pulskamp, Judge.

J. M. Malik, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench, and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant and appellant Johnson Ram was charged with two counts of gross vehicular manslaughter and one count of speeding after the semitruck he was driving ran into a pickup truck and the two pickup truck occupants died. A jury convicted defendant of both felony counts of gross vehicular manslaughter (Pen. Code, § 192, subd. (c)(1)),[1] and the court found defendant guilty of the speeding infraction. Defendant was sentenced to three years four months in state prison. Defendant filed a timely appeal.

On appeal, defendant claims he received ineffective assistance of counsel when his attorney failed to object to alleged propensity evidence and to the argument from the prosecution that he had a character for recklessness and indifference to others. The People argue defendant fails to show his counsel was ineffective or that he was prejudiced as a result. We agree with the People and affirm the judgment.

**FACTUAL BACKGROUND**

**I.      Prosecution Evidence**

Kewal Garg is a semitruck driver who worked with defendant as a codriver for about two to three months with the same company.[2] On November 1, 2019, Garg was involved in a collision with defendant in Bakersfield while heading southbound on Highway 99. Garg estimated he had driven with defendant on that portion of southbound Highway 99 10 to 15 times before the accident. On the day of the incident, defendant was the driver of the semitruck, Garg was the codriver, seated on the passenger side, and defendant's nephew, who was around 30 to 35 years old, was in the back sleeper area. They began driving from Fresno between 10:00 a.m. and 11:00 a.m. They were heading

---

[1] Undesignated statutory references are to the Penal Code.

[2] Garg explained that one must pass a written test and a road test in order to get a Class A license for driving a semitruck. Class A drivers are not allowed to use a cell phone or be distracted while driving. The speed limit in California for a semitruck is 55 miles per hour, and a semitruck should keep a distance of about 100 feet or more from the traffic in front. A fully loaded semitruck stops slower and is supposed to increase the distance from other vehicles in traffic.

south hauling a full load of produce, which would typically weigh 70,000 to 80,000 pounds. Defendant drove for about two hours before the accident occurred. Traffic was normal busy, and they were traveling in the right lane. Garg testified defendant is a very good driver and, during the period of time before the collision, defendant had not engaged in any unsafe maneuvers, unsafe turns, or acted in any way that was counter to their training and experience. Garg did not notice traffic slow in front of them because he was looking down at his phone and not up at the windshield. He also did not see what the traffic was like right before the accident but thought everything was normal and smooth until defendant slammed the brakes so hard the tires were screeching; the collision occurred within seconds. After the collision, they all exited the vehicle quickly. Garg was not injured during the crash. He used defendant's new phone to call the company.

About 30 to 45 minutes before the collision, defendant handed Garg a new cell phone for Garg to activate for him. Garg had to call the cellular provider for assistance. Garg did not remember if he called any other numbers from defendant's phone to test it. Garg activated the cell phone and gave it back to defendant before the collision. Garg did not see defendant or defendant's nephew use his cell phone or make any calls from the new phone.

In the five minutes or so before the collision, Garg was not speaking with defendant or watching what defendant was doing because Garg was busy reading the news on his own phone. Garg did not know where defendant's phone was or if defendant was looking at his phone just before the crash. He also did not notice whether defendant was distracted or not looking at the road before the crash. There was no music playing, and Garg did not hear defendant speak to his nephew or anyone else on the phone. He did not recall if defendant's nephew was doing anything to distract defendant before the crash. He also did not see defendant scrolling, texting, or doing anything else on his phone before the accident, though Garg admits he was not looking at defendant just before the crash.

3.

Robert and Cheryl Harskamp were traveling southbound on Highway 99 through Bakersfield on November 1, 2019, when they observed a vehicle accident. Robert was driving a 30-foot Class A motorhome in the slow, right lane. Their motorhome was tall and gave them a good view of the roadway. The weather was fine; the sun was out, and the road was dry.

The Harskamps estimated the accident occurred about five semitruck lengths in front of them, or about 800 to 1,000 feet ahead. The accident involved two semitrucks colliding with a vehicle crumpled in between like an accordion and beyond recognition. The semitrucks were in the slow, right lane heading south. Cheryl could not see whether brake lights of the rear semitruck had been applied or not, but she did not hear the sound of screeching tires before impact. The Harskamps estimated they were going between 45 to 55 miles per hour, and the semitruck was going around 55 miles per hour.

There was an average amount of traffic at the time. Robert said that the slow lane in this part of the highway is usually congested because of trucks exiting Highway 99 onto Highway 58. Additionally, there was construction set up in between the northbound and southbound lanes. Traffic was slowing down in the slow lane, and Cheryl saw traffic was stopped ahead. The Harskamps were decelerating before the collision occurred.

Robert saw a tremendous debris cloud and alerted his wife that something happened. Cheryl had been walking around in their motorhome and came up towards the front when they both observed the vehicle that was in between the trucks fly out. It went across the highway right in front of them into the left, fast lane. Neither one knew what happened at the time; they thought something had fallen off the truck. They did not know at the time that the object going across the highway was a pick-up truck. The semitruck immediately in front of Harskamp had to move to the right to avoid colliding with the stopped vehicles, and the Harskamps had to move left to the middle lane to avoid the collision. They moved forward slowly through the area of the collision and noticed debris all over the place. When the Harskamps were closer to the accident, they

4.

saw that the object that went across the highway in front of them was some kind of vehicle. Robert said, "Boy, if there's somebody in there, they're not alive[.]"

The rear semitruck ended up "piggyback" on the back end of the semitruck in front. Robert observed what he believed to be the driver of the rear semitruck looking very upset and walking around. Robert never saw the driver go to the crumpled car.

Joanna Pinedo was traveling the opposite direction, heading northbound on Highway 99 when she also witnessed the accident. She was traveling about 70 miles per hour in the fast lane, closest to the median. Nothing was obstructing her view and traffic appeared normal. Pinedo missed the initial impact of the collision but saw two semitrucks "jiggling back and forth" and "moving in a way … they shouldn't be." Pinedo did not hear any screeching tires. She saw the vehicle pop out and land only about four feet away from her. The vehicle was mangled, and Pinedo knew the people in the car would be deceased. After the accident, traffic in the southbound, slow lane accumulated and slowed to a standstill. Pinedo called the police.

California Highway Patrol (CHP) Officer Maxwell Taylor was dispatched to the scene of the accident. He noted the weather was dry and the sky was clear that day and the portion of the freeway was flat and straight. There was a concrete K-rail in between the southbound and northbound lanes due to road construction. When Officer Taylor arrived, he saw that two big rigs and another vehicle had been involved in a collision. Several photographs from the accident were admitted into evidence. The red Freightliner semitruck collided into the Peterbilt semitruck in front and went up onto the flatbed trailer of the Peterbilt. Officer Taylor did not observe any skid marks behind the Freightliner semitruck, nor were any skid marks visible in the photographs introduced at trial. Neither were any skid marks depicted in the diagram drawn of the accident scene, which would have been included if there were any. A cell phone was recovered on the driver's side floorboard underneath the brake pedal of the Freightliner.

5.

The other vehicle in the collision was determined to be a Dodge Ram pickup truck. It ended up about 75 feet away from the Freightliner. A few different human body parts like an arm and a hand were observed sticking out of the vehicle, but that was all that could be seen at the time. Later it was determined there were two occupants of the pickup truck who were deceased.

Officer Taylor conducted two recorded interviews of defendant. The second interview was with the assistance of a Punjabi language translator after it appeared to Officer Taylor that defendant had some language barriers. The recordings of both interviews were admitted into evidence and portions of the interviews were played for the jury. In his interview with Officer Taylor, defendant explained that he was traveling at 40 miles per hour in the right lane, and he slowed down to 20 miles per hour as traffic in front of him started to slow. Defendant stated traffic suddenly became slow, and he applied the brake, but it did not work fully as they were going downhill. Defendant said that he hit the Dodge pickup truck first, causing it to go to the left. Defendant felt the greatest impact when he hit the big rig in front of the Dodge pickup truck, which caused his vehicle to stop. After his truck stopped, defendant went to the Dodge pickup truck but could not see the driver and thought the driver must have gotten out. He saw the driver of the red Freightliner truck standing on the side of his truck. Defendant did not call 911 but told his codriver to call the company.

Sergeant Robert Shaw was a certified accident reconstructionist with CHP whose job was to download and analyze data from the vehicles. Shaw gathered information out of the air bag control of the Dodge pickup truck and the heavy vehicle event data recorder from the Freightliner, the semitruck defendant was driving. Information from the pickup truck revealed there was a nondeployment event when the pickup truck was hit from behind. Two-tenths of a second later, there was an airbag deployment event, which was a front-to-rear event, when the vehicle was going forward and hit something. Then there was a third event when the pickup truck was pushed forward again from behind and then

6.

a fourth event when it hit something in front again, recording as a second deployment event.

A semitruck has an event data recorder that records information like how fast it is going, when the brakes are on and off, and sudden stop events. A sudden stop event is determined by a change of velocity of seven miles an hour in a one second span of time. When Sergeant Shaw downloaded the data from the Freightliner, he was able to detect two hard brake events. The first hard brake event occurred about four days prior to the crash; somewhere around 400 or 500 miles prior to this incident. The second hard brake event was determined to be connected to the accident based on the odometer of the truck and the time of the crash indicating the hard brake occurred at 12:27 p.m. on November 1, 2019. After including the one minute of clock drift, the time stamp lined up with the report indicating the accident occurred at 12:26 p.m.

The data revealed there was nothing wrong with the semitruck's system, and there were no issues with the tires or driving axles. Sergeant Shaw noted that the cruise control was active the entire time before the crash; set at 60 miles per hour. There was no steering input, no throttle input, and no brake input. This meant the driver had not applied any brake and sustained 60 miles per hour the entire time until just before impact. Then the data showed a change of speed from 60 miles per hour to 49 miles per hour within one second. The change of 11 miles per hour in one second was thought to be the result of brake application and impact. However, Shaw agreed it was possible the semitruck could have slowed 11 miles per hour within one second by just slamming on its brakes. However, in the following second, the speed decreased about 30 miles per hour, which could not have happened applying brakes alone. Shaw explained this substantial change of speed could have only resulted from hitting a big object like the other big rig.

Data from the Dodge pickup truck indicated that it was traveling about 24 miles per hour and slowed to about 9 to 11 miles per hour within the five seconds prior to the

7.

accident. The steering wheel was relatively straight, the accelerator pedal was not being applied, the brakes were on, and the brake lights were illuminated the entire five seconds before the crash. The data showed an initial impact from the rear, which was a non-airbag deployment event. The pickup truck went from about 11 miles per hour to 55 miles per hour in two-tenths of a second. The pickup truck was thrown forward and hit the big rig in front of it, setting off the airbags as a deployment event, slowing the speed about 35.9 miles per hour. The pickup truck was hit again from behind and thrown forward again into the big rig in front. Sergeant Shaw explained that the pickup truck bounced in between the two big rigs until it was crushed up and got spit out the side.

CHP Officer Steven Stover assisted in the investigation of the collision by downloading information from a cell phone that was seized from the Freightliner semitruck defendant was driving. The data was extracted from the cell phone, then processed through software that interprets the data into a readable form. A report containing the information from the cell phone was introduced into evidence as People's Exhibit 3. The data showed nine recorded phone calls made on the date of the accident, November 1, 2019. The first outgoing call was on November 1, 2019, at 11:22:54 a.m. It was answered and lasted 27 seconds. The data showed seven additional outgoing phone calls made from 11:23:30 a.m. to 12:12:18 p.m. These calls were also answered and lasted from 22 seconds to about eight minutes. The last outgoing phone call was made at 12:24:43 p.m. but was not answered.[3]

The calls were not made through Bluetooth or Siri or any other hands-free method. The data revealed the calls were made by physically manipulating the device and typing in the numbers on the phone's screen. The data could not reveal who typed the phone numbers into the device. Officer Stover noticed some artifacts not included in the report

---

[3] The estimated time of the collision was 12:26 p.m.

8.

that indicated both user interaction with the phone and that there were incoming text messages.

## II.    Verdict and Sentencing

Defendant was charged with unlawful killing of victim 1 without malice aforethought, with gross negligence, as a proximate result of violating Vehicle Code section 22350 (§ 192, subd. (c)(1), count 1), unlawful killing of victim 2 without malice aforethought, with gross negligence, as a proximate result of violating Vehicle Code section 22350 (*ibid*., count 2), and violating the speed law, an infraction (Veh. Code, § 22350, count 3).

The jury found defendant guilty of both counts of gross vehicular manslaughter, and the court found defendant guilty of the speeding infraction. The court sentenced defendant to the low term of two years on count 1 plus a consecutive term of one third the middle term, which was one year four months, on count 2, for a total term of three years four months state prison.

**DISCUSSION**

## I.    Defendant Fails to Demonstrate He was Denied Effective Assistance of Counsel

Defendant claims he was prejudiced by his trial counsel's failure to object to prejudicial and irrelevant testimony and argument, which had the effect of showing defendant had character traits for recklessness and indifference towards others. The People maintain that defendant fails to establish his counsel was ineffective or that he was prejudiced as a result. We agree with the People and find no error.

### A.    *Relevant Factual and Procedural History*

Data from defendant's semitruck reflected two hard braking events in which the semitruck slowed by seven or more miles an hour in one second. The first hard braking event occurred about four days before the crash. The second hard braking event occurred at the time of the current crash. Defense counsel did not object to the elicitation of the

9.

prior hard brake event as propensity evidence under Evidence Code sections 1101 or on other grounds. The first hard brake event was not mentioned during closing arguments.

In closing argument, the prosecution explained, "The only real issue in this case is whether his conduct was gross negligence or simply criminal negligence and whether it was gross negligence or criminal negligence determines whether he's guilty of felony gross vehicular manslaughter or misdemeanor vehicular manslaughter." The issue came down to the determination of the degree of defendant's negligence. "That lesser included offense is vehicular manslaughter with criminal negligence. It has similar elements. What separates this lesser offense from the greater offense of gross vehicular homicide is the degree of negligence. Was he grossly negligent when he killed [Victim 1] and [Victim 2] or did he act with criminal negligence? Like I said earlier, that's what this case is all about, the degree of negligence."

"Now he was driving a 70[-] to 80,000-pound semitruck when he made the decision to take his eyes off the road. He was driving at 60 miles per hour, again five miles per hour above the speed limit for the truck, with the cruise control on and was not looking at the roadway for nearly five seconds, a crowded roadway, crowded freeway, where there was a construction area, where it is a known area for slowing traffic there at where the Highway 58 interchange heads off towards Tehachapi." "He was not looking at the road for those five seconds driving at 60 miles per hour a 70,000[-]pound semitruck. It does not really matter what had distracted him for those five seconds. It doesn't matter whether it was that phone that he spent some time on in evidence that was found under the brake pedal. … And it doesn't matter if he was distracted by his nephew in the backseat as we learned during the course of the trial that [defendant's] nephew was in the sleeper area. It doesn't matter if he happened to be looking at what Mr. Garg was looking at on his phone.… What is important is that he allowed himself to become distracted for five seconds, at least five seconds. That is a total disregard for the safety and welfare of other motorists on the road. That is gross negligence."

In rebuttal, the prosecutor added the following response: "Now [defense counsel] would ask you to believe that this was sort of a mistake in judgment. That he is not indifferent to the destruction that he caused. Now there is a reason, you know, I said that he was indifferent. His indifference, his choices caused this, caused the deaths of [the victims], not only based on his not looking at the road for five seconds but after he did this, after he turned [the victim]'s truck into that, his first instinct was to tell Mr. Garg, the co-driver, to call the trucking company. Not call 911 but the trucking company. He took two lives and caused immeasurable grief to their families and his concern was for the load he was hauling. That is an indifference to the consequences of your actions."

**B.** *Standard of Review and Applicable Law*

Ineffective assistance of counsel claims are mixed questions of law and fact and are " 'generally subject to independent review as predominantly questions of law ....' " (*In re Resendiz* (2001) 25 Cal.4th 230, 248–249, abrogated by *Padilla v. Kentucky* (2010) 559 U.S. 356, 370 on other grounds; *People v. Taylor* (1984) 162 Cal.App.3d 720, 724–725 [we defer to the trial court's findings but exercise de novo review over the ultimate issue of whether defendant's constitutional rights were violated by ineffective assistance of counsel].)

A claim of ineffective assistance of counsel has two components. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or … sentence resulted from a breakdown in the adversary process that renders the result unreliable." (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)

11.

In evaluating trial counsel's actions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland*, *supra*, 466 U.S. at p. 689; see *People v. Dennis* (1998) 17 Cal.4th 468, 541.) Thus, a defendant must overcome the presumption that the challenged action might be considered sound trial strategy under the circumstances. (*Strickland*, *supra*, at p. 689; *People v. Dennis*, at p. 541.) "Reasonableness must be assessed through the likely perspective of counsel at the time." (*People v. Ochoa* (1998) 19 Cal.4th 353, 445.)

" '[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' " (*People v. Lopez* (2008) 42 Cal.4th 960, 972; *People v. Hillhouse* (2002) 27 Cal.4th 469, 502; see also *People v. Dickey* (2005) 35 Cal.4th 884, 914; *People v. Boyette* (2002) 29 Cal.4th 381, 433; *People v. Beagle* (1972) 6 Cal.3d 441, 458 [Generally, failure to make objections is a matter of trial tactics as to which [a reviewing court] will not exercise judicial hindsight].) "The mere failure to object to prosecutorial argument, however, rarely establishes incompetence on the part of defense counsel in the absence of some explanation on the record for counsel's action or inaction." (*People v. Samayoa* (1997) 15 Cal.4th 795, 855; *People v. Wharton* (1991) 53 Cal.3d 522, 567.)

Further, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." (*Strickland*, *supra*, 466 U.S. at p. 691; cf. *United States v. Morrison* (1981) 449 U.S. 361, 364–365.) Accordingly, "actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." (*Strickland*, at p. 693.) "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

**C.** *Analysis*

Defendant argues he received ineffective assistance of counsel when his trial counsel failed to object to alleged prior bad acts and propensity or character evidence. First, defendant faults trial counsel for not objecting to the evidence his semitruck had an earlier hard braking event. He argues, "[w]hen the jury was exposed to the fact that [defendant's] Freightliner had experienced two hard brake events, one four days prior to the crash and the second around the moment of the crash, the jury was informed that [defendant] was prone to 'recklessness,' an element of gross negligence, prone to having to apply brakes at the last second, and prone to getting into crashes or hitting others with his massive Freightliner." (Fn. omitted.) Second, defendant claims his counsel erred in failing to object to the prosecutor's statements during closing argument that defendant "acted with a complete indifference for human life, an element of gross negligence, because his first instinct, after taking the lives of two people, was to call the trucking company and not 911." Defendant claims "[t]he jury was informed [defendant] had a character trait for gross negligence whilst he drove the Freightliner." Defendant argues that "[b]oth these instances are clear examples of introducing and arguing for character or propensity evidence: Because [defendant] was reckless four days prior, he must have been reckless moments before the crash, and because [defendant] was indifferent after the crash, he must have been indifferent before the crash...." The People disagree, arguing the evidence does not support defendant's assertions, and he has not established prejudice.

" '[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' " (*People v. Lopez*, *supra*, 42 Cal.4th at p. 972, quoting *People v. Hillhouse*, *supra*, 27 Cal.4th at p. 502; see also *People v. Boyette*, *supra*, 29 Cal.4th at p. 433.) Evidence Code section 1101, subdivision (a) "prohibits the admission of character evidence if offered to prove conduct in conformity with that character trait, sometimes described as a propensity to act in a certain way." (*People v.*

13.

*Bryant, Smith, and Wheeler* (2014) 60 Cal.4th 335, 405–406, fn. omitted.) Section 1101, subdivision (b) provides for the admission of uncharged acts when relevant to prove some other disputed fact such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake of fact or accident. (*People v. Bryant*, at pp. 405–406; *People v. Ewoldt* (1994) 7 Cal.4th 380, 393.) " '[I]t must be established by a preponderance of evidence that the prior bad act actually occurred.' " (*People v. Mani* (2022) 74 Cal.App.5th 343, 369.)

Here, defendant concedes there was no evidence or argument from the People that he was driving the semi-truck at the time of the first hard brake event. As such, this evidence does not qualify as a prior bad act. (See *People v. Mani*, *supra*, 74 Cal.App.5th at p. 369 [" '[I]t must be established by a preponderance of evidence that the prior bad act actually occurred' "].) Since there was no evidence defendant committed the prior hard braking event, nor argument attempting to connect defendant to the prior braking event, it would have been unreasonable for trial counsel to view such evidence as a prior bad act. Therefore, we cannot conclude defense counsel's performance here was deficient.

We disagree with defendant that the "only logical conclusions a jury exposed to this evidence would draw are that [defendant] was a bad driver, with a history of having to apply last second hard brakes or (almost) getting into collisions.…" Rather, as discussed, there was no evidence the first hard brake incident four days prior to the accident was tied to defendant. There was also no other evidence defendant had a history of being a bad driver. To the contrary, Garg testified defendant was a very good driver and that prior to the collision, defendant had not engaged in any unsafe maneuvers, unsafe turns or acted in any way that was counter to their training and experience. And even if there was evidence defendant was the driver during the prior hard brake event (which there was not), evidence of that incident is not evidence of a crime or bad behavior. Rather, absent any information surrounding the event, it does not even insinuate fault.

14.

Second, defendant argues his postaccident conduct – asking Garg to call their company first – was irrelevant as to how he acted in the moments leading up to the accident. Accordingly, defendant claims his counsel should have objected to the following comments made by the prosecutor in closing argument: "there is a reason … I said that he was indifferent … not only based on his not looking at the road for five seconds but after he did this, after he turned [victim 1's] truck into that, his first instinct was to tell Mr. Garg, the codriver, to call the trucking company. … He took two lives and caused immeasurable grief to their families and his concern was for the load he was hauling. That is an indifference to the consequences of your actions."

A claim that defense counsel failed to object to closing argument seldom establishes incompetence of counsel. (*People v. Douglas* (1990) 50 Cal.3d 468, 539, abrogated on other grounds in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4; see *People v. Kelly* (1992) 1 Cal.4th 495, 540; *People v. Najera* (2006) 138 Cal.App.4th 212, 225 [defense counsel was not ineffective in failing to object to prosecution's misstatements on summation as to law of voluntary manslaughter; defendant suffered no prejudice because evidence did not raise voluntary manslaughter issue]; *People v. Mesa* (2006) 144 Cal.App.4th 1000, 1010 [defendant was not prejudiced by counsel's failure to object to prosecution's closing argument concerning absence of certain exculpatory evidence, even though argument was improper comment on defendant's right not to testify; review of evidence of defendant's guilt, prosecution's entire argument, and court's instructions to jury showed that failure to object did not adversely affect outcome of trial]; cf. *People v. Anzalone* (2006) 141 Cal.App.4th 380, 395 [defense counsel in attempted murder case was prejudicially ineffective in failing to object to prosecution's argument misstating law of concurrent intent; argument left jury with mistaken impression that by firing indiscriminately in direction of group of people, the defendant was guilty of attempting to kill them all].)

15.

And here, defendant's conduct after the collision could have been considered relevant to a finding of conscious indifference and to proving gross negligence, an element of gross vehicular manslaughter. (See § 192, subd. (c)(1).) "Gross negligence is the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences." (*People v. Bennett* (1991) 54 Cal.3d 1032, 1036, citing *People v. Watson* (1981) 30 Cal.3d 290, 296.) " 'The state of mind of a person who acts with conscious indifference[] to the consequences is simply, "I don't care what happens." ' (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988.)" (*People v. Bennett,* at p. 1036.) As our Supreme Court stated in *Bennett*, " 'the finding of gross negligence … may be based *on the overall circumstances surrounding* the fatality.' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1208, quoting *People v. Bennett*, at p. 1040.) Courts have considered postcrime actions and statements to be relevant to gross negligence. (See *People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1172 [postcrime actions and statements relevant to gross negligence]; e.g., *People v. Thompson* (2010) 49 Cal.4th 79, 113 [evidence of a "defendant's postcrime actions and statements can support a finding that defendant committed a murder for which his specific mental state is established by his actions before and during the crime"].)

Thus, counsel could have reasonably believed evidence of defendant's postaccident conduct was relevant and admissible to the disputed issues at trial, namely whether defendant acted with gross negligence. As such, defendant has not overcome the "strong presumption that [his] counsel's conduct [fell] within the range of reasonable professional assistance." (See *Strickland*, *supra*, 466 U.S. at p. 689.) Accordingly, because the appellate record does not preclude a satisfactory explanation for counsel's actions in not objecting, we cannot conclude defense counsel acted deficiently. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266; *People v. Pope* (1979) 23 Cal.3d 412, 426, overruling on another ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.)

In any case, we also cannot conclude defendant was prejudiced by his counsel's alleged errors. Defendant fails to show there is a reasonable probability that, but for his counsel's allegedly unprofessional errors, the result of the proceeding would have been different. (*People v. Dennis*, *supra*, 17 Cal.4th at pp. 540–541; *People v. Howard* (1987) 190 Cal.App.3d 41, 47 [a "reasonable probability" the defendant would have been convicted had the challenged evidence been excluded].)

As discussed, no evidence was admitted showing defendant was the driver for the first hard brake event. Therefore, contrary to defendant's argument, evidence of the prior hard brake event was unlikely to have made any impact on the jury or the outcome of the trial. And the prosecutor's comments during closing argument that defendant's choice to call his company first rather than check on the victims demonstrated continued indifference would have had minimal effect on the jury's determination of gross negligence since the prosecution made it clear that "[w]hat [was] important [was] that [defendant] allowed himself to become distracted for five seconds, at least five seconds. That is a total disregard for the safety and welfare of other motorists on the road. That is gross negligence."

Further, we disagree that this was a close case. Defendant claims the evidence of actual carelessness before the accident was not that strong and therefore "there exists a significant doubt of whether the jury would have found [defendant] guilty if this evidence had been excluded." The prosecution's case focused on the five seconds prior to the collision, regardless of what distracted defendant. For five entire seconds, although the vehicle directly in front of defendant slowed from 24 miles per hour to 9 miles per hour, engaging their brake lights the entire time, defendant kept his 60,000[-] plus pound vehicle set on cruise control going 60 miles per hour, without slowing at all, until just before the collision. The evidence demonstrates that defendant was not paying attention to the road, despite traffic slowing in front of him, and despite the fact he was in an area where there was construction.

Additionally, we reject defendant's argument the jury could have reasonably concluded he could have been applying the hand brake before the collision since Sergeant Shaw did not know whether the data would show if someone had applied the handbrake instead of the foot brake. Here, there was no evidence the semitruck slowed down before the collision. As discussed, the data pulled from the semitruck, within five seconds before the collision, revealed defendant was still traveling with cruise control set at 60 miles per hour until just before impact. The weight of this testimony was important, as defendant agrees. There was also no evidence supporting defendant's suggestion that the Dodge pickup truck may have suddenly appeared in front of the defendant's Freightliner since the data showed the pickup truck was going straight the entire five seconds before the collision.

Therefore, based on the totality of evidence in this record, it is not reasonably probable the outcome of this trial would have been different absent defense counsel's alleged errors. The evidence, regardless of defendant's actions after the accident, clearly establishes his guilt. Thus, our confidence in the outcome of this matter is not undermined. (See *Strickland*, *supra*, 466 U.S. at p. 694.) Accordingly, we reject defendant's ineffective assistance of counsel claim.

## DISPOSITION

The judgment is affirmed.

POOCHIGIAN, Acting P. J.

WE CONCUR:

FRANSON, J.

PEÑA, J.